STATE OF MAINE

YORK, ss.

STACEY THOMPSON,

Plaintiff

v.

DE DONUNTS, INC.,

Defendant

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-07-158

DONALD L. GARBRECHT LAW LIBRARY 2008

ORDER

This case comes before the Court on Defendant DE Donuts, Inc.'s (DDI) Motion for Summary Judgment pursuant to M.R. Civ. P. 56. Following hearing, the motion is denied.

## FACTUAL BACKGROUND

The facts of this case arise from allegations that Plaintiff Stacey Thompson (Ms. Thompson), an employee of Defendant DE Donuts, Inc. (DDI), was subjected to a hostile work environment due to DDI owner/operator, Steve Sparangis' (Mr. Sparangis) sexually harassing conduct (Conduct). Ms. Thompson was a manager at the Dunkin Donuts Shop operated by DDI on Spruce Street in Biddeford, Maine, from April 25, 2002 through April 29, 2006. She was hired by Mr. Sparangis and worked with him at the Spruce Street location throughout her employment with DDI.

Ms. Thompson helped to develop DDI's Harassment Prevention Policy in late 2003 or early 2004. She understood that an employee could use the internal complaint process to address a harassment complaint and/or could file a complaint with the Equal Employment Opportunity Commission (EEOC) and the Maine Human Rights

Commission. A poster from the Maine Human Rights Commission regarding sexual harassment was posted in the break room.

Ms. Thompson was openly critical of Mr. Sparangis' management style. (Thompson dep. 38: 19-24; 31: 23-25; 32: 1-2.) The two periodically disagreed in front of other employees.[1] (*Id.* at 33: 17-23.) It is uncontested that Mr. Sparangis is "aggressive, loud, abrupt, not gentle, and dresse[s] [both men and women] down in front of others." (S.M.F. ¶ 60.)

Ms. Thompson complained of Mr. Sparangis' behavior to Tim Nye and Dionisios "Danny" Bouzianis. Tim Nye worked at DDI's Spruce Street location from 1998 through 2004. Danny Bouzianis was a co-owner of the Spruce Street DDI. Ms. Thompson never complained to the EEOC or the Maine Human Rights Commission prior to bringing this lawsuit.

On April 29, 2006, Ms. Thompson and Mr. Sparangis argued and Ms. Thompson quit, without notice. Ms. Thompson had taken the initiative to fix a "drawer on the sandwich station." Mr. Sparangis' response to her initiative was to say that "it's about time you do something right." (*Id.* at 35: 3-11.) Later that day Ms. Thompson confronted him about the comment and his sarcastic demeanor. (*Id.* at 37-38.) In her deposition she states that her reason for leaving was the way he treated people in general: his sarcasm, lack of appreciation, unwillingness to compliment and "much more." (*Id.* at 39: 8-18.)

Ms. Thompson alleges that she left her position with DDI because she could no longer tolerate Mr. Sparangis' conduct. She also alleges that she frequently reported the conduct to other store managers according to DDI sexual harassment policy guidelines.[2]

---

[1] The extent of their overt disagreements is in dispute, but it is not disputed that the two "kind of bickered" at least once a week. (S.M.F. ¶¶ 23-25.)

[2] This is a material fact in dispute.

2

## STANDARD OF REVIEW

Summary judgment is proper where there exist no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. A genuine issue is raised "when sufficient evidence requires a fact-finder to choose between competing versions of the truth at trial." *Parrish v. Wright*, 2003 ME 90, ¶ 8, 828 A.2d 778, 781. A material fact is a fact that has "the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18, 22. When a defendant seeks summary judgment, a "plaintiff must establish a prima facie case for each element of her cause of action." *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 9, 711 A.2d 842, 845. At this stage, the facts are reviewed "in the light most favorable to the nonmoving party." *Lightfoot v. Sch. Admin. Dist. No. 35*, 2003 ME 24, ¶ 6, 816 A.2d 63, 65.

Parties may file affidavits in support of or in opposition to a summary judgment motion, but "[c]onclusions of fact and law do not properly belong in an affidavit filed in support of a motion for summary judgment." *Town of Orient v. Dwyer*, 400 A.2d 660, 662 (Me. 1985). The affidavits must be "made on personal knowledge [and] shall set forth such facts as would be admissible in evidence, . . ." M.R. Civ. P. 56(e). Any affidavit testimony that clearly contradicts prior sworn testimony, without a satisfactory explanation, will not be admitted. *Zip Lube, Inc. v. Coastal Savings Bank*, 1998 ME 81, ¶ 10, 709 A.2d 733.

DISCUSSION

Ms. Thompson complains that the conduct of Mr. Sparangis created a "sexually hostile environment" which DDI failed to promptly remedy, resulting in a violation of the Maine Human Rights Act (MHRA).[3] In order to survive summary judgment, Ms. Thompson must establish prima facie a sexual harassment based, hostile work environment claim and establish a basis for employer liability. *Champagne*, 1998 ME 87, ¶ 9, 711 A.2d at 845. DDI proffers the affirmative *Faragher-Ellerth* defense against employer liability on the claim.

## I.     Hostile Work Environment Claim

Ms. Thompson asserts that Mr. Sparangis' conduct created a sexually hostile work environment.

### a.     Elements of a Sexual Harassment Hostile Work Environment Claim

The elements of a sexual harassment hostile work environment claim are:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*Crowley v. L.L. Bean Inc.*, 303 F.3d 387, 395 (1st Cir. 2002). The motivation for the harassment "must stem from sexual desire or . . . gender hostility or both." *Lee-Crespo v. Schering-Plough Del Caribe Inc*, 354 F.3d 34, 44 (1st Cir. 2003) (citations omitted). "Hostile

---

[3]     The MHRA has been interpreted under the same analytical framework as Title VII of the Civil Rights Act of 1964 (Title VII). *Higgins v. The TJX Cos., Inc.*, 331 F.Supp. 2d 3, 6 (D. Me. 2004). Under Title VII it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367, 370 (1993)(*quoting* 42 U.S.C. § 2000e-2(a)(1)).

4

environment claims involve repeated or intense harassment sufficiently severe or pervasive to create an abusive working environment." *Doyle v Dept. of Human Servs.*, 2003 ME 61, ¶ 23, 824 A.2d 48, 56. The conduct need not be both severe and pervasive to be deemed unlawful. *Nadeau v. Rainbow Rugs, Inc.*, 675 A.2d 973, 976 (Me. 1996).

DDI asserts that Ms. Thompson has failed to show that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment. Though generally a "hostile environment harassment claim involves a pattern of inappropriate conduct, there is no requirement that harassment occur more than one time in order to be actionable." *Id.* The sufficiency of the hostility of the work environment is determined through all of the circumstances" including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Fontanez-Nunez*, 447 F.3d at 56 (*quoting Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 46 (1st Cir. 2003). The inquiry is both subjective (abusive to the employee) and objective (would a reasonable person perceive the environment as hostile or abusive). *Blake v. State*, 2005 ME 32, ¶ 9, 868 A.2d 234, 238. "In order to demonstrate a hostile work environment in the case of a supervisor-subordinate, the subordinate must show that the hostility was severe or pervasive, and that it extended beyond the normal tension that exists in many supervisor-supervisee relationships." *Id.* ¶ 10, 868 A.2d at 238 (*citing Nadeau*, 675 A.2d at 967).

The inquiry is fact intensive. For example, the Law Court found sufficient support for a sexual harassment claim when an employer made a sexual overture (offered money for sex) to an employee on one occasion, but requested that the employee subsequently lie about those interactions to co-workers. *Nadeau*, 675 A.2d at

976. The *Nadeau* Court found that "a reasonable person could find [the employer's] conduct sufficiently severe to alter the conditions of employment and to create an abusive or hostile work environment." *Id.* Likewise, a federal district court found that the severity and pervasiveness of ten incidents of perceived harassment over a six-month period was a material fact in dispute because a reasonable person could find the incidents created a hostile and abusive environment. *Chaloult v. Interstate Brands Corp.*, 508 F. Supp 2d 103, 107 (D. Me. 2007). In that case the incidents considered contained sexual overtures, comments about the plaintiff's body and comments about the plaintiff's sex life. *Id.* at 105-106.

In contrast, the episodic "boorish and unprofessional" behavior of a supervisor toward an employee over a period of a year and a half was found insufficient to support a hostile work environment claim. *See Lee-Crespo*, 354 F.3d at 46-47. The supervisor in that case repeatedly pried into the plaintiff's personal life, made false statements about her to other co-workers, threatened certain work hour adjustments when the relationship was not going well, and made subtle sexual innuendos. *Id.* at 38-40. Nor has vulgar or inappropriate language, alone, been found sufficient to support a harassment claim. *Fontanez-Nunez*, 447 F.3d at 57. That court stated that "[w]hile vulgar language was inappropriate to the workplace and completely unprofessional, mere offensive utterances that did not unreasonably interfere with the employee's work performance do not amount to harassment that in essence altered the terms or conditions of Fontanez's employment." *Id.* The Court's rationale was that mere utterances are not the focus of discrimination laws. *Id. (quoting AMTRAK v. Morgan*, 536 U.S. 101, 116 (2002)). The incidences before the *Fontanez-Nunez* Court occurred over a five-year period and included lewd gestures, accusations that the plaintiff was gay, use of "foul language and . . . sexual and gender-based harassing comments . . .," and

6

suggestions that the plaintiff was "looking for a homosexual to have sexual relations with him." *Id.* at 53.

In this case Ms. Thompson claims that she was subjected to sexual harassment "several times per week" over a period of approximately four years. The harassment included:

1) Mr. Sparangis told Ms. Thompson that "you're soft, you are a girl" if she cried when he yelled at her. This statement was made roughly 3-4 times over the four-year period of Ms. Thompson's employment. (SMF ¶¶ 48-50.)

2) Mr. Sparangis made comments to Ms. Thompson implying that she was having sex with numerous men. Specifically, several times a week when she waited on a male customer Mr. Sparangis would say, "are you doing him now," or "is he the next one?" (SMF ¶ 51.)

3) When Ms. Thompson received a phone call at work Mr. Sparangis asked "is he the next one you are screwing or are you fucking him too." This happened once. (SMF ¶ 52.)

4) Ms. Thompson alleged that if she said she was tired or sore "Mr. Sparangis would say that it was because I was having too much sex." (Complaint ¶ 11.) Some instances he used the word sex, some times Ms. Thompson inferred that he meant too much sex when he said "too much fun or too much lifting." Most often he used the term "lifting." (Thompson Depo. 76: 24-25.) These comments occurred frequently during her employment under Mr. Sparangis ("dozens and dozens of times").

5) Mr. Sparangis would inquire if Ms. Thompson was having sex with the vendors in exchange for favorable treatment. This happened three or four times over the four-year period. (SMF ¶ 55.)

6) Once or twice a month, if Mr. Sparangis saw a female employee speaking to a male he would ask Ms. Thompson "if she is doing him now" or "is that her new boyfriend?" (SMF ¶ 56.)

7) Mr. Sparangis would regularly call Ms. Thompson names such as "you fucking idiot," "moron" and "stupid."

8) Mr. Sparangis did not treat his male managers in a similar manner. Ms. Thompson stated that that meant that he expected more from her in terms of better numbers and controlling things in the store. (SMF ¶¶ 58-59.)

(Pl. Br. at 3.) Considering the incidents above, the Court deems incidents 7 and 8 not gender based and therefore not part of the harassment inquiry. Additionally, the court deems incident number 4 admissible only to the degree that Mr. Sparangis specifically spoke about sex. However, based on incidents 1-6, using both a subjective and objective standard, and considering all of the circumstances as we must, there are material facts in dispute whether the incidents created a hostile and abusive environment. Accordingly, summary judgment is improper on the elements of a hostile work environment claim.

However, in order to proceed, Ms. Thompson must show some basis for the liability of DDI.

II. **Vicarious Liability**

Ms. Thompson asserts that DDI had notice of, but failed to remedy a sexually hostile work environment created by her supervisor, DDI owner/operator Mr. Sparangis. When an employee seeks to hold an employer liable for the harassing conduct of a supervisor she must show either that there was a tangible employment action (i.e. hiring, firing, failing to promote, etc. . . ) or that there was a constructive alteration to the terms of the employment because the harassment was sufficiently

severe or pervasive. In the later case, an affirmative defense exits. *Lee-Crespo*, 354 F.3d at 43 (citations omitted).

In this case there are no allegations of a tangible employment action by DDI, thus Ms. Thompson has the burden to show that she was constructively discharged.

a.     *Faragher-Ellerth* **Affirmative Defense**

Even if Ms. Thompson can prove to a fact finder that the harassment constructively altered the terms of her employment, DDI can avoid liability if it can show "a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behaviors, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Arrieta-Colon v. Wal-Mart Puerto Rico, Inc.*, 434 F.3d 75, 85-86 (1st Cir. 2006)(citations omitted).[4] This has been dubbed the Ellerth-Faragher (or alternatively the Faragher-Ellerth) Defense. *See Id.; see also Chaloult*, 508 F.Supp 2d at 107. DDI "bears the burden of proof as to both elements." *Arietta-Colon*, 434 F.3d at 86.

**i. Employer Care**

Thus DDI must show that it exercised due care to prevent or promptly correct any sexually harassing conduct. *See Chaloult*, 508 F. Supp. At 107. An employer's "proof" of an anti-harassment policy with a complaint procedure available to employees, while not necessarily dispositive, is relevant. *Arietta-Colon*, 434 F.3d at 86.

In this case it is undisputed that DDI had an anti-discrimination policy (Policy) and that Ms. Thompson not only knew of the Policy but that she helped to develop it.

---

[4]     A successful claim of constructive discharge does not bar the defense unless it can be shown that the "supervisor's action was an official action." *Arietta-Colon*, 434 F.3d at 86 (citations omitted). No such claim is made in this case.

9

(Thompson Dep. at 7-9.) New hires were required to read the Policy. *Id.*[5] The Policy states that DDI will not tolerate sexual harassment and will do what is necessary to remedy it. *Id.* It further states that employees have alternate remedies under federal law. *Id.* Moreover, it is uncontested that a Maine Human Rights Commission poster regarding the prohibition on sexual harassment was posted in the break room. (SMF ¶ 11.) The Court deems this sufficient to partially satisfy the first prong.

With respect to the corrective element of the first prong, DDI does not argue that it corrected the alleged harassment but that it was "deprived of any opportunity to correct and avoid" the conduct because of Ms. Thompson's failure to avail herself of the preventative or corrective procedures provided by the Policy. (*See* DDI Br. at 17.)

### b. Employee Corrective or Preventative Measures

Thus the dispositive issue of the affirmative defense becomes whether Ms. Thompson availed herself of the preventative or corrective procedures provided by the Policy. These facts are in dispute. In her deposition, Ms. Thompson asserts that she reported the Conduct to both Tim Nye, a former manager of the Spruce Street Store, and to Mr. Danny Bouzianis, co-owner of the Spruce Street DDI. (Thompson Depo. at 63 & 71.) Nye and Bouzianis deny that such reports were made. No one contests that this would be sufficient notice to DDI; rather DDI asserts that Ms. Thompson did not make any sexual harassment complaints to either of the managers, but merely vented about Mr. Sparangis' boorish behavior. (*See generally* SMF ¶¶ 36-47.) This is a credibility question for the fact-finder. Accordingly, summary judgment is not proper.

---

[5] To the degree the Ms. Thompson's affidavit is inconsistent with her deposition testimony, the Court will consider only her deposition testimony as her prior sworn statement.

# CONCLUSION

Defendant's motion for summary judgment is denied.

The clerk may incorporate this order in the docket by reference.

Dated: July //, 2008

G. Arthur Brennan
Justice, Superior Court

Guy Loranger, Esq. - PL
Robert Kline, Esq. - DEF

11